UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

L.W. *and* K.C., *individually and on behalf of L.C.W., a child with a disability*,

                                 Plaintiffs,

                    -v-

NEW YORK CITY DEPARTMENT OF EDUCATION,

                                 Defendant.

24 Civ. 9701 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This case involves a claim for tuition reimbursement by the parents of L.C.W., a teenage student with disabilities.  After the New York City Department of Education ("DOE") failed to provide L.C.W. with a free appropriate public education ("FAPE") as required by the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1415 *et seq.*, L.C.W.'s parents placed her in a fully online private school between September 2023 and January 2024. In state administrative proceedings, the parents sought reimbursement for that placement, but, after a hearing, an impartial hearing officer ("IHO") denied the request, and a state review officer ("SRO") affirmed.  Both the IHO and SRO found that the parents' decision to enroll L.C.W. at that school was not reasonably calculated to meet her specific needs.  The parents then filed this action against DOE, seeking reversal of that determination under the IDEA and the New York State Education Law § 3202 *et seq.* and its regulations, 8 N.Y.C.R.R. § 200 *et seq.*

Now pending are cross-motions for summary judgment.  For the following reasons, the Court sustains the findings below that the parents have not justified the placement as appropriate based on L.C.W.'s needs, and therefore grants DOE's motion and denies the parents' motion.

I.      **Factual Background**[1]

   A.      **L.C.W.'s Disabilities, and Educational History Before the 2023–2024 School Year**

L.C.W. has been diagnosed with autism spectrum disorder ("ASD"), attention deficit hyperactivity disorder ("ADHD"), generalized anxiety disorder, persistent depressive disorder, and trauma and stressor-related disorder. R6–18 ("SRO Decision") at R7. Although her general cognitive functioning is in the "high average range," she has a long history of severe "school refusal" that stems from serious psychological issues. R131–51 ("2022 IEP") at R132; R183–88 (affidavit of parent L.W., or "L.W. Aff.") at R183–84. The Court recaps below L.C.W.'s treatment and education preceding the 2023–2024 semester at issue.

In third grade (the 2015–2016 school year), while living in New York, L.C.W. began exhibiting anxiety and lack of engagement in school. R19–35 (IHO's findings of fact and decision, or "FOFD") at R23. By the end of fourth grade (the 2016–2017 school year), she was refusing to go to school. *See* L.W. Aff. at R183. In summer 2017, she moved to Indiana to reside with one of her parents, who are separated. *Id.* There, her school refusal and psychological issues worsened. *Id.* During the fall semester of eighth grade (the 2020–2021 school year), certain traumatic events caused her to "spiral downward." *Id.* (sealed description of such). As a result, in December 2020, the parents placed her in an in-patient, short-term psychiatric facility in California. *Id.* at R184.

---

[1] The Court's account of the underlying facts is drawn from the certified record of the administrative proceeding, submitted by the parents. Dkts. 30, 30-1–30-25. This includes, *inter alia*, (1) the August 21, 2024 SRO decision ("SRO Decision"); (2) the IHO's June 15, 2024 findings of fact and decision ("FOFD"); (3) exhibits submitted by both sides in the administrative proceeding; and (4) transcripts of the administrative proceeding. Because these materials were filed on ECF as one continuous record, not as individual exhibits, the Court cites the consecutive Bates numbers in the certified record.

In January 2021, L.C.W. underwent a comprehensive neurocognitive evaluation (the "2021 evaluation"), which diagnosed her with the disorders listed above: to wit, ASD, ADHD, generalized anxiety disorder, persistent depressive disorder, and trauma and stressor-related disorder.  FOFD at R22–23; R70–71.  The evaluating clinician recommended, *inter alia*, that L.C.W. continue receiving cognitive behavioral therapy and attend a therapeutic boarding school specializing in "an academic and emotional curriculum for children with ASD and ADHD." FOFD at R22–23.  On that basis, Indiana deemed her eligible for special education and developed an individualized education plan ("IEP") for her (the "Indiana IEP").  *See* FOFD at R22–23.

Between January 2021 and summer 2022, L.C.W. was placed in two residential therapy facilities in Utah.  L.W. Aff. at R184.  There, she received individual therapy, specialized instruction in small-group settings, and support for daily executive functioning skills.  *Id.*

### B.    DOE's Individualized Education Plan

In summer 2022, the parents moved L.C.W. back to New York.  *Id.*  In July 2022, the parents requested that DOE evaluate L.C.W. for eligibility for special education services.  *Id.*  In connection with that request, the parents submitted the 2021 evaluation and Indiana IEP.  *Id.* at R184–85.  In September 2022, while that request was pending, the parents unilaterally placed L.C.W. at Academics West, a private special education school, where she spent the 2022–2023 school year.  *See id.*; SRO Decision at R8.  The parents obtained tuition reimbursement from DOE for that placement through an administrative proceeding, which is not in dispute here. L.W. Aff. at R185; SRO Decision at R8.

On October 7, 2022, DOE conducted a psychoeducational evaluation of L.C.W.  FOFD at R23.  That evaluation concluded that she exhibited "clinically significant" issues including

anxiety and depression. *Id.* On December 5, 2022, a committee on special education deemed L.C.W. eligible for special education and developed an IEP for her (the "2022 IEP"). *Id.* at R24.

The 2022 IEP classified L.C.W. as having an "Other Heath Impairment." 2022 IEP at R131. It stated that she had been diagnosed with the disorders listed above. *Id.* It found that L.C.W.'s general cognitive ability fell within the "high average range" and that she was performing academically at grade level. *Id.* at R132–33. However, her "social-emotional functioning was a main presenting concern." *Id.* The IEP noted her "history of school refusal and serious social concerns." *Id.* It stated that she experienced "emotional distress throughout the school day" and required significant support. *Id.* For example, when overwhelmed at school, she would "shut down," refusing to communicate aside from nodding her head, and could take up to an hour and a half to reengage. *Id.* Such withdrawal appeared to be triggered by sensory overload, depressive thoughts, or "random mood swings with no apparent trigger." *Id.* The IEP noted that she was then "attending school on a limited schedule" of one-to-two hours each school day. *Id.* It found, due to L.C.W.'s "current social/emotional functioning, including moderate to severe symptoms," that special education services were warranted to "properly modify and individualize the curriculum/learning environment." *Id.* at R135.

Based on these findings, the 2022 IEP recommended that L.C.W. attend an "8:1+1" special education program (eight students per teacher and teaching assistant) in a state-approved nonpublic school, with interim placement in a non-specialized school offering "integrated co-teaching services." *Id.* at R143 (cleaned up); SRO Decision at R8. It also recommended that L.C.W. receive, each week, a 40-minute session of individual counseling and a 40-minute session of group counseling. 2022 IEP at R143; SRO Decision at R8.

**C.     Correspondence Between L.C.W.'s Parents and DOE Concerning the 2023–2024 School Year**

On June 29, 2023, the parents sent a letter to DOE, stating that they had not been informed of a placement for L.C.W. for the 2023–2024 school year.  SRO Decision at R8.  The letter stated that, as a result, the parents intended to place her unilaterally in a private school for that year and retroactively seek reimbursement for that placement.  *Id.*  The letter noted L.C.W.'s need for "ongoing therapeutic services and support, including social skills groups, executive functioning supports, counseling, and parent training."  *Id.*

On August 25, 2023, DOE sent a letter to the parents.  R217–28 ("August 25 Letter") at R222.  It summarized recommendations for both interim and permanent placements, SRO Decision at R8, and identified a particular special education school, August 25 Letter at R222.[2] The parents represent, however, that "by September 2023, DOE still had not provided . . . any [nonpublic school] option."  L.W. Aff. at R185 (cleaned up); *see also* SRO Decision at R8.

**D.     The Parents' Decision to Place L.C.W. at Winston Preparatory School's Online Program During the 2023–2024 School Year**

According to the parents, during the 2022–2023 school year, L.C.W. had struggled to attend Academics West in person.  L.W. Aff. at R185.  Her parents thus "decided to try an online program for the 2023–2024 school year to reduce her anxiety and stressors."  *Id.*  They began the admissions process at Winston Preparatory School's Online Program ("Winston").  *Id.*

Winston is a "fully online program for students through 12th grade with learning differences."  R189–95 (affidavit of Jaclyn Siegel, or "Siegel Aff.") at R190.  Students are grouped primarily by their "learning profiles," and then by grade level.  *Id.*  For example, a group may comprise "9th and 10th grade dyslexic students."  *Id.*  Students attend "seven live,

---

[2] The record does not indicate whether this school was to be an interim or permanent placement.

video conferenced classes" Monday through Friday. *Id.* at 192. These remote classes are 45 minutes each, except on Wednesdays, when they last 30 minutes each. *Id.* Students receive a five-minute break between each class. *Id.* Winston also features a so-called "Focus" program. *Id.* at R191. This program "provides a daily, 45-minute one-to-one remedial instruction session for each student targeting individual goals in the areas of greatest need." *Id.* Each Focus instructor communicates with the student's parents and other teachers. *Id.*

As part of the admissions process at Winston, L.C.W.'s parents shared with Winston her educational records from earlier school placements, the 2021 evaluation, and the 2022 IEP. L.W. Aff. at R185–86. Winston interviewed L.C.W., and her parents "extensively" discussed her needs with Winston admissions staff. *Id.* (cleaned up). According to parent L.W., Winston's Focus program had the capacity to help L.C.W. because it would give her opportunities to "discuss the issues that she was dealing with, both academically and socially, so that she can be encouraged to stay on track." *Id.* (cleaned up).

According to Winston's head of school, Jaclyn Siegel—who submitted an affidavit and testified in the administrative proceedings before the IHO—L.C.W. had "interviewed very well" with Winston admissions staff. Siegel Aff. at R193–94. Siegel attested that L.C.W. had "a similar learning profile" as a group of other students at Winston and that that group "would be a good fit" for L.C.W. *Id.* Siegel attested that "we [at Winston] felt that we could address her academic needs," "with the understanding that [L.C.W.] was going to be seeing a new therapist" outside of school. *Id.* She attested: "It is important to note that Winston [] is not an emotional or behavioral disabilities school, and this was something that the admissions counselor was very clear with [L.C.W.'s] parents about." *Id.*

On August 30, 2023, the parents signed an enrollment agreement with Winston for L.C.W. to attend the school during the 2023–2024 school year.  SRO Decision at R8.

### E.    L.C.W.'s Placement at Winston Between September 2023 and January 2024

On September 6, 2023, L.C.W. began attending Winston via videoconference.  *See* L.W. Aff. at R185.  She was grouped with "three to four other students" with "similar learning profiles."  Siegel Aff. at R194.  This group had adequate comprehension, but "a harder time with the mechanics of learning"—*i.e.*, "executive functioning"—"which can impact their ability to demonstrate their understanding of the materials."  *Id.*  As part of this group, L.C.W. took "content classes," such as literature, math, and chemistry.  *Id.*

In Winston's Focus program, L.C.W. received "one-to-one daily remedial instruction."  *Id.*  In that program, L.C.W. had "the following academic problem-solving goals":

> increase academic confidence, resilience, and endurance in the online classroom; utilize strategies in order to sustain academic attention and address challenging or non-preferred tasks; and develop effective communication and self-advocacy skills when tasks or assignments are challenging.

*Id.*

According to Siegel, "[i]t became apparent right away that [L.C.W.] was struggling to attend all of her classes."  *Id.* at R194–95.  "She very rarely had her camera on in her content classes, and she began to stop attending."  *Id.*  Accordingly, "a plan to get her back into her classes was developed."  *Id.*  As part of that plan, L.C.W.'s Focus instructor "was in constant communication with [L.C.W.'s] parents, her therapist and psychiatrist [outside the school], and teachers."  *Id.*  And "a schedule was created for [L.C.W.] to follow about which classes to attend and when"—for example, L.C.W. was to attend literature and math classes, and complete history and science assignments "independently."  *Id.*  However, L.C.W.'s attendance and completion of

independent assignments continued to drop, and she "stopped attending all classes and stopped completing all work." *Id.*

By January 2024, L.C.W.'s "persistent school refusal" led Winston staff to recommend to her parents that they transfer her to Laurel Springs School ("Laurel Springs"), a "self-paced online program that does not require scheduled attendance in synchronous classes." *Id.* Later that month, L.C.W. switched to Laurel Springs. L.W. Aff. at R187.

L.C.W.'s parents paid $28,028.89 in tuition for L.C.W.'s attendance at Winston between September 2023 and January 2024. *Id.*

**F.     The State Administrative Proceedings**

On April 15, 2024, L.C.W.'s parents filed a due process complaint with DOE. SRO Decision at R8; *see also* R94–98 (due process complaint). The complaint alleged that DOE had not provided L.C.W. with a FAPE for the 2023–2024 school year. SRO Decision at R8. It sought, *inter alia*, reimbursement of the tuition the parents had paid Winston.[3]

On May 31, 2024, IHO Roberta Wolf presided over a due process hearing (the "hearing") via videoconference. *See* FOFD at R21. In connection with the hearing, both sides submitted various exhibits. *Id.* at R34. The parents also submitted affidavits by L.W. and Siegel. *Id.* These individuals also testified remotely at the hearing. R244–316 ("Hr'g Tr.") at R264, 288.

---

[3] The complaint also sought reimbursement for L.C.W.'s placement at Laurel Springs for the remainder of the 2023–2024 school year. SRO Decision at R8 n.1. The IHO denied that claim, finding that the parents had not shown that placement to have been appropriate, because they had not presented evidence that it "provided *any* special education and supports, let alone services that support emotional and behavioral disorders." FOFD at R30–31 (emphasis in original). The parents did not appeal that decision to the SRO and do not seek its review here. SRO Decision at R8 n.1.

### 1.    IHO Wolf's Findings of Fact and Decision

On June 15, 2024, IHO Wolf issued the FOFD.  FOFD at R19.  It found that the parents had not carried their burden to show that L.C.W.'s placement at Winston was appropriate. FOFD at R31.  The FOFD thus dismissed their claim for reimbursement.  *Id.* at R32.

The FOFD began by noting that DOE had conceded failing to (1) develop an updated IEP for L.C.W. for the 2023–2024 school year, and (2) place L.C.W. at an educational program since December 2022.  FOFD at 22.  It noted, however, that DOE challenged the parents' placement of L.C.W. at Winston as inappropriate, on the ground that Winston was a "purely academic and wholly online program that did not offer the special education supports and services (*e.g.*, counseling, a therapeutic environment) that [L.C.W.] required."  *Id.* (cleaned up).

In its factual findings, the FOFD noted L.C.W.'s undisputed eligibility for special services in 2023–2024.  *Id.* at R22.  It chronicled, across five double-spaced pages that cited to the hearing transcript and exhibits, facts supporting her eligibility, including the 2021 evaluation and its diagnoses as to L.C.W., the 2022 IEP's findings, and L.C.W.'s school refusal and mental health issues leading up to her placement at Winston.  *Id.* at R22–27.  The FOFD further found, tracking DOE's concession to this effect, that DOE had not provided L.C.W. with an interim or permanent placement for 2023–2024.  *Id.* at R24.  As to L.C.W.'s unilateral placement at Winston, the FOFD recounted L.W. and Siegel's hearing testimony and affidavits.  *Id.* at R25– 27.  It described how L.C.W. "immediately exhibited school refusal" upon matriculating at Winston, eventually causing Winston to recommend her transfer to Laurel Springs.  *Id.*

In its analysis, the FOFD first found—as followed from DOE's concessions—that DOE had failed to offer L.C.W. a FAPE for the 2023–2024 school year.  *Id.* at R29.  It then considered whether L.C.W.'s placement at Winston had been appropriate for her needs.  *Id.* at R29–30.

"[A] private placement is only appropriate," it noted, "if it provides education instruction specifically designed to meet the unique needs of a child." *Id.* (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 115 (2d Cir. 2007)).

The FOFD found that although L.C.W. had been diagnosed with multiple emotional and behavioral disorders, Winston "had no expertise in providing special education and support services for students" with these. *Id.* Winston did not, for instance, offer "counseling services," as recommended by the 2022 IEP. *Id.* And although L.C.W. met one-on-one with a Focus instructor daily, that instructor had not been shown to have had any training relevant to mental health disorders. *Id.* The instructor instead provided "remedial academic" support to "*all* students" at Winston, not therapeutic support tailored to L.C.W. *Id.* (emphasis in original). The FOFD also found that L.C.W.'s report from Winston did not reflect measurable goals or instruction designed specifically to meet her needs. *Id.* The Focus program's objectives were "vague and immeasurable." *Id.* And the goals for L.C.W.'s content classes applied equally to all students in L.C.W.'s class (*e.g.*, selecting long-term projects, breaking down tasks into manageable portions, and learning about chemistry). *Id.*

The FOFD observed that L.C.W.'s past evaluations had recommended, effectively, a program that was the opposite of Winston. *Id.* These had urged that L.C.W. receive "more oversight, more supports, and more interaction to help her stay engaged, remain on-task, manage her emotions and coping skills, and improve her social interactions and social skills." *Id.* Instead, the FOFD observed, her placement at Winston had entailed "an online classroom with limited oversight and few supports to redirect her attention." *Id.* And, it noted, L.C.W. had "immediately" exhibited school refusal upon matriculating at Winston, which worsened until her parents withdrew her from that school. *Id.*; *see also id.* at R26–27.

10

The FOFD thus concluded that the parents had not established that L.C.W.'s placement at Winston was "specially designed to meet her unique needs, supported by such services as are necessary to permit her to benefit from that instruction." *Id.* at R30. It denied the parents' request for reimbursement of L.C.W.'s tuition there. *See id.* at R32.

### 2.    SRO Harrington's Decision

On July 25, 2024, the parents appealed the FOFD. R45–56 ("Request for Review"). They argued that the IHO had erred in finding Winston an inappropriate placement on the grounds that Winston did not provide education and support aimed at addressing L.C.W.'s particular educational and mental health needs. *See* SRO Decision at R9. On July 29, 2024, DOE answered. R57–64.

On August 21, 2024, SRO Sarah L. Harrington issued a decision, spanning more than 12 single-spaced pages. SRO Decision at R18. It began with a detailed account of the facts, procedural history and governing legal standards in the Second Circuit. *Id.* at R7–13. It then assessed whether Winston was appropriate for L.C.W. under the totality of the circumstances. It found that "the issue identified repeatedly in the record as the overarching concern [as to L.C.W.] was [her] school refusal, which was significantly impacted by her social/emotional difficulties." *Id.* at R15. However, it found, Winston was "not an emotional or behavior disabilities school," and did not provide individual or group counseling. *Id.* at R15–16 (cleaned up). Indeed, it noted, according Siegel, the program "really focused on academics." *Id.* (cleaned up). Winston had determined that it "could address [L.C.W.'s] academic needs," provided that L.C.W. would be treated by a therapist outside Winston. *Id.* And L.W. had testified that L.W. had been aware, before enrolling L.C.W. at Winston, that the school "did not address emotional and behavioral issues." *Id.*

The SRO's decision next noted that L.W. had also testified that the Focus program was "as close to [counseling] as you could expect," and that L.C.W.'s Focus teacher was in "constant communication" with her parents, outside therapist, and teachers. *Id.* at R16–17. But, the SRO found, this program was inadequate to address L.C.W.'s emotional and behavioral needs. According to Winston's fall 2023 report concerning L.C.W., L.C.W.'s Focus program was largely focused on improving L.C.W.'s "academic and social stamina." *Id.* To those ends, the program, had taught her executive functioning skills (such as following "a consistent structure, daily schedules and checklists, [and] plans for completion of classwork") and social skills (such as through "weekly self-reflections to improve self-advocacy skills"). *Id.* But, SRO Harrington stated, "notably absent from the fall 2023 report is any discussion of the specially designed instruction Winston [] implemented to address [L.C.W.'s] social/emotional needs, which played at least an equal if not greater role in her school refusal." *Id.* And although L.W. had testified that L.C.W.'s Focus teacher was "very responsive" and "immediately communicated" with the parents and other Winston teachers to try to keep L.C.W. academically engaged, "the only strategies the parent identified were that the student's teachers 'allowed her to sometimes turn off her camera or reduce pressure to interact with peers' during class." *Id.* (quoting L.W. Aff. at R186). The SRO found that "the approach of reducing demands on [L.C.W.] did not serve to address [her] social/emotional needs, as avoiding a need does not serve the same purpose or have the same effect as addressing it." *Id.* The SRO also noted that the record did not reflect the substance of conversations L.C.W.'s Focus teacher had had with others about how to support L.C.W., other strategies discussed or implemented by Winston staff, or any effect these had on L.C.W.'s attendance and participation. *Id.* On these bases, the SRO found an insufficient basis

12

to disturb the IHO's determination that the parents had not met their burden of showing placement at Winston was appropriate. *Id.* She therefore dismissed the appeal. *Id.* at R17–18.

### G.    This Lawsuit's Procedural History

On December 17, 2024, the parents filed the Complaint, seeking reversal of the denial of tuition reimbursement. Dkt. 1. On March 3, 2025, DOE answered. Dkt. 12. On April 1, 2025, the Court adopted the parties' proposed summary judgment briefing schedule. Dkt. 15.

On August 22, 2025, after multiple extensions, the parents filed the certified administrative record under seal, and a redacted version on the public docket. Dkt. 30. On August 25, 2025, the parents moved for summary judgment. Dkt. 31 ("Parents' Mem."). On October 10, 2025, DOE cross-moved for summary judgment. Dkt. 34 ("DOE Mem."). On October 30, 2025, the parents replied. Dkt. 35 ("Parents' Reply"). On November 10, 2025, DOE replied. Dkt. 36 ("DOE Reply").

## II.    Standard of Review

A federal court's review of state educational decisions under the IDEA is circumscribed. *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (citation omitted). The court undertakes an independent review of the administrative record and makes a determination based on a preponderance of the evidence, *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1120 (2d Cir. 1997), but this review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review," *Gagliardo*, 489 F.3d at 112–13 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)). A court must give "due weight" to these proceedings, "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Id.* (cleaned up). Deference

to administrative proceedings is "particularly warranted when the district court's decision is based solely on the administrative record." *Id.* at 113.

### III.    Discussion

The sole issue here is whether the parents have carried their burden to show that Winston was an appropriate placement for L.C.W. between September 2023 and January 2024.

#### A.    Applicable Legal Standards as to Appropriateness of a Unilateral Placement

Parents who believe that New York State has not provided their child a FAPE "may, at their own financial risk, enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state." *Gagliardo*, 489 F.3d at 111; *see A.C. ex rel. M.C. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009). The parents bear the burden of showing that the unilateral placement was appropriate. *Gagliardo*, 489 F.3d at 112; *see* N.Y. Educ. L. § 4404(1)(c).

The standards for determining whether a private school placement is appropriate under the IDEA "closely resemble, but do not mirror," those for assessing the adequacy of a proposed public placement by the school district. *A.D. v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 690 F. Supp. 2d 193, 206 (S.D.N.Y. 2010); *see Gagliardo*, 489 F.3d at 112. Subject to certain exceptions,[4] "the same considerations and criteria that apply in determining whether the school district's placement is appropriate should be considered in determining the appropriateness of the parents' placement." *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006). The "issue turns on whether a placement—public or private—is 'reasonably calculated to enable the child to receive educational benefits.'" *Gagliardo*, 489 F.3d at 112 (quoting *Frank G.*, 459

---

[4] Unlike a public placement, a private placement need not meet state education standards, provide certified special education teachers, or provide an IEP for the student. *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006).

F.3d at 364); *see also Frank G.*, 459 F.3d at 363. "[T]he test for the parents' private placement is that it is appropriate, and not that it is perfect." *Frank G.*, 459 F.3d at 364. An appropriate private placement is one "likely to produce progress, not regression." *Gagliardo*, 489 F.3d at 112 (quoting *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 130 (2d Cir. 1998)).

The Second Circuit has described the inquiry as follows:

> No one factor is necessarily dispositive in determining whether parents' unilateral placement is reasonably calculated to enable the child to receive educational benefits. Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs. To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential. They need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.

*Id.* (quoting *Frank G.*, 459 F.3d at 364–65).

### B.    Analysis

Applying the above standards, the Court considers (1) the SRO's ruling that the parents failed to show that Winston was an appropriate placement for L.C.W. so as to entitle them to tuition reimbursement under the IDEA, and (2) the parents' critiques here of that ruling.

#### 1.    Evaluation of the SRO's Ruling

L.C.W.'s educational profile and particular needs are not in dispute. *See* SRO Decision at R8. As chronicled above, in 2021, her general cognitive abilities were assessed to be "in the high average range." *Id.* at R13. As of the 2022 IEP, she was performing on grade level in reading, writing, and math—unlike in most IDEA cases—albeit with some difficulties with grammar, multi-step problems, and pattern recognition. *Id.* L.C.W. centrally suffers, however, from ASD, ADHD, generalized anxiety disorder, persistent depressive disorder, and trauma and

15

stressor-related disorder.  SRO Decision at R7.  She has a "long history," beginning in third grade, of refusing to attend school.  FOFD at R23.

As of the January 2021 neurocognitive evaluation, L.C.W.'s "social-emotional functioning was a main presenting concern" that caused "challenges in her social interactions and social communication skills."  SRO Decision at R14.  For these reasons, the evaluating clinician recommended her placement at a therapeutic boarding school specializing in an "academic and emotional curriculum appropriate for children with ASD and ADHD."  FOFD at 23.  The 2022 IEP noted that her behavioral and social-emotional assessment scores were "clinically significant" with respect to internalizing problems, anxiety, and depression.  *Id.* According to the IEP, she experienced "emotional distress throughout the school day" and required "a lot of support."  SRO Decision at R14.  For example, when overwhelmed at school, L.C.W. would "shut down" and refuse to communicate aside from nodding her head, and it could take up to an hour and a half for her to reengage.  *Id.*  She exhibited challenges related to executive functioning, such as shifting auditory and visual attention.  *Id.* at R13.  The IEP found that she "needed support with task prioritization, teacher prompting, and frequent redirection." *Id.* at R13–14.  Based on these findings, the IEP recommended that L.C.W. attend an 8:1+1 special education program a state-approved nonpublic school, with interim placement in a non-specialized school offering "integrated co-teaching services."  2022 IEP at R143 (cleaned up); SRO Decision at R8.  It also recommended that she receive, each week, one 40-minute session of individual counseling and one 40-minute session of group counseling.  2022 IEP at R143; SRO Decision at R8.

Between December 2020 and summer 2022, L.C.W. had been placed in three consecutive in-patient or residential therapeutic facilities focused on treatment.  *See* L.W. Aff. at R184.  She

16

then spent the 2022–2023 school year at Academics West—a private, in-person, special education school in New York, for which the parents received tuition reimbursement in an earlier administrative proceeding.  *Id.* at R185; SRO Decision at R8.  But, according to the parents, L.C.W. struggled to commute to and attend Academics West, so they "decided to try an online program"—Winston—"to reduce her anxiety and stressors."  *Id.* at R185.

Strikingly unlike the four preceding institutions at which L.C.W. had previously been placed, Winston was neither a therapeutic facility nor a special education school.  Nor was it an "emotional or behavior disabilities school," as Winston admissions staff had made "very clear" to L.C.W.'s parents before her enrollment.  Siegel Aff. at R194.  The school was fully online, and its focus was academic, albeit geared toward students with "learning differences" such as dyslexia and ADHD.  Siegel Aff. at R190, 194; *see also id.* (L.C.W. placed in small group of students struggling with "executive functioning").  In the affidavit submitted by the parents and in her testimony at the administrative hearing, Siegel repeatedly emphasized that the school provided only "academic" programming—and not behavioral, emotional, or therapeutic support. *See* SRO Decision at R15–16; Siegel Aff. at R193–94 ("with the understanding that [L.C.W.] was going to be seeing a new therapist, [Winston admissions staff] felt that [Winston] could address her academic needs"); Hr'g Tr. at R281 (Siegel: "we [at Winston] really focus on the academics . . . academic problem solving, reading comprehension, written expression, lots of different areas like that"); *id.* (Siegel: "we don't have counseling at Winston"); *id.* (Siegel: "based on [L.C.W.'s] academic needs, we felt we were an appropriate placement").  And, as to the Focus program—Winston's individualized, one-on-one remedial instruction sessions— L.C.W.'s fall 2023 report from the school reflects that the "primary" aims that program had for her were to "develop her academic and social stamina and her ability to appropriately utilize self-

17

advocacy and self-reflection skills." R164–172 ("Fall 2023 Report") at R164. It also provided that, because L.C.W.'s school refusal was "consistently affected by weaker executive functioning skills," her Focus teacher would help develop her "ability to manage her time, prioritize tasks and responsibilities, . . . and sustain focus when working on novel or unfamiliar exercises." *Id.* Thus, the record reflects, at most, that Winston factored L.C.W.'s emotional and behavioral background, including by teaching skill-building with respect to executive functioning, into its attempts to facilitate her academic progress. But this programming was undisputably aimed at academic progress, not at therapeutic support.

That such a placement was a mismatch for L.C.W.'s individual needs surfaced immediately. According to Siegel, "[i]t became apparent right away"—*i.e.*, upon L.C.W.'s matriculation at Winston—"that [she] was struggling to attend all of her classes." Siegel Aff. at R194–95. "She very rarely had her camera on in her content classes, and she began to stop attending." *Id.* Notwithstanding her Focus teacher's coordination with her content teachers, outside therapist, and parents, L.C.W.'s attendance and completion of independent assignments continued to plummet. *Id.* She "stopped attending all classes and stopped completing all work." *Id.* In January 2024—approximately four months after her enrollment—Winston recommended that L.C.W. transfer to Laurel Springs, at which her parents enrolled her later that month. *Id.*

The assembled record reflects shows that Winston was a mismatch—and from the start clearly not an appropriate fit—for L.C.W. in light of her substantial non-academic needs. L.C.W. does not lack intellect: her full-scale IQ score was in the high average range. And— despite years of school refusal, and emotional and behavioral issues—she continued, as of the 2022 IEP, to perform largely at grade level. As the SRO found, L.C.W.'s deeply rooted pattern of school refusal instead stemmed principally from her "social/emotional needs," which derived

from, or were closely associated with, her diagnoses of ASD, ADHD, persistent depressive disorder, and trauma and stressor-related disorder. SRO Decision at R7, 17; *see also* L.W. Aff. at R183. Indeed, the 2021 evaluation had found that L.C.W.'s "social-emotional functioning was a main presenting concern," and that she exhibited deficits in social-emotional reciprocity, nonverbal communications, and understanding and maintaining relationships. R100–30 ("2021 Eval.") at R124–25. It recommended placement at a "therapeutic boarding school" specializing in an "academic and emotional curriculum appropriate for children with ASD and ADHD." *Id.* at R127. And the 2022 evaluation noted that these "behavioral/social-emotional difficulties" were continuing to "interfer[e] with her ability to participate in the school setting." R210–12 ("2022 Eval.") at R210. The 2022 IEP thus recommended placement in a New York state– approved special education program with weekly individual and group counseling. 2022 IEP at R204. And in the parents' June 29, 2023 letter to DOE, notifying it that they intended to place L.C.W. in a private school unilaterally and to seek reimbursement, the parents acknowledged that she "requires ongoing therapeutic services and support, including social skills groups, executive functioning supports, counseling, and parent training." R152–53 ("June 29 Letter") at R152.

In light of these documented challenges, it was reasonable for the IHO and SRO to conclude that L.C.W.'s placement at Winston was not "likely to produce progress." *Gagliardo*, 489 F.3d at 112. Winston is a "fully online program" focused on academics and thus did not offer any counseling, therapeutic support, or other means of addressing L.C.W.'s deeply rooted emotional and behavioral issues. Siegel Aff. at R190–92. Although it caters to students with "learning differences," such as dyslexia and ADHD, it, as advertised, focused on L.C.W.'s "academic needs." *Id.* at R190, 193–94. But the "overarching concern" for L.C.W.'s

19

development, as the SRO noted, was her persistent school refusal, stemming largely from her "social/emotional difficulties" and the "interplay between symptoms of [her] autism, ADHD, anxiety, depression, and trauma diagnoses." SRO Decision at R15. A therapeutic or special needs placement would have centrally addressed these issues. Winston's singular focus on academic progress, in contrast, at most sought to minimize the *symptoms* arising from L.C.W.'s diagnosed conditions. But it did not address her underlying needs themselves. As a result, as the SRO noted, Winston largely acceded to L.C.W.'s school refusal, reducing the number of content classes she was required to attend and, of those she did attend, allowing her to "sometimes turn off her camera" and avoid interacting with peers during class. *See id.* at R17. The parents did not adduce any evidence below that these measures were tailored to support L.C.W.'s social and emotional needs. The opposite appears so: as the SRO reasonably noted, "the approach of reducing demands on the student did not serve to address the student's social/emotional needs, as avoiding a need does not serve the same purpose or have the same effect as addressing it." *Id.* In other words, although Winston's approach may have sidestepped potential conflict, it veered from the path of seeking social and emotional growth. Although a private placement need not be "perfect," it must be "appropriate." *Frank G.*, 459 F.3d at 364. The record here supports the common conclusion of the SRO and IHO that L.C.W.'s placement at Winston was not reasonably calculated to meet L.C.W.'s needs—that it was not an appropriate placement.

The SRO's considered decision warrants deference, for multiple reasons. First, it reflects a detailed and comprehensive engagement with the record. *See, e.g.*, SRO Decision at R7–8, 13–14 (chronicling L.C.W.'s educational history, diagnoses, and treatment); *id.* at R15–18 (describing Winston's programming for L.C.W., including hearing testimony by L.W. and Siegel). And its reasoning is sound and amply supported by the evidence. *See, e.g.*, *Walczak v.*

*Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998) (deference "particularly appropriate" where SRO's decision "thorough and careful"); *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012) ("deference owed to an SRO's decision depends on the quality of that decision," including whether it is "well-reasoned"); *Stevens ex rel. E.L. v. N.Y.C. Dep't of Educ.*, No. 09 Civ. 5327, 2010 WL 1005165, at *9 (S.D.N.Y. Mar. 18, 2010) (deference "particularly appropriate" where SRO's decision is "well-reasoned" and "well-grounded in the evidence").

Second, it relied on the same written record that this Court has examined, which the parents have not supplemented in this litigation. *See Gagliardo*, 489 F.3d at 113 ("deference to the administrative proceedings is particularly warranted when the district court's decision is based solely on the administrative record" (citing *Frank G.*, 459 F.3d at 367)).

Third, it addressed a core question of educational policy within the SRO's competence: whether Winston offered a curriculum appropriately addressed to L.C.W.'s unique needs. *See W.A. v. Hendrick Hudson Cent. Sch. Dist.*, 927 F.3d 126, 147 (2d Cir. 2019) ("the question of whether a private school placement provided special education services is precisely a question on which we defer to educational experts" (citing *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 451–52 (2d Cir. 2015)). The SRO's informed assessment was that L.C.W.'s placement at Winston "avoided," rather than "addressed," her substantial emotional and social needs. *Id.* at R17 (cleaned up). Because the parties' dispute turns on issues squarely within the SRO's expertise, the Court appropriately gives "substantial deference" to the SRO, lest it substitute less informed "notions of sound educational policy for those of the school authorities." *Gagliardo*, 489 F.3d at 112–13 (quoting *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir. 2005) and *Rowley*, 458 U.S. at 206). This dispute does not turn on statutory construction or other pure

questions of law, as to which the Court's review would be *de novo*.  In any event, for the reasons

reviewed above, even were deference not due, the Court finds convincing the SRO's

conclusions, anchored as they are in a detailed and independent review of the record.  Affording

the decision "due weight," and "mindful that the judiciary generally lacks the specialized

knowledge and experience necessary to resolve persistent and difficult questions of educational

policy," the Court does not find any reason to disturb the well-supported SRO decision.  *Id.*

at 113 (cleaned up).

That outcome accords with Second Circuit precedent.  Particularly apposite is *Gagliardo*.

There, the Circuit considered whether a solely academic private placement was adequately

tailored to the needs of a student with mental health disabilities.  *Id.* at 110–11.  The student had

been diagnosed with Asperger's syndrome ("a mild [form of ASD]"), "depression," and

"anxiety," which, despite his "very superior intellectual capacity," resulted in "school refusal"

and "social withdrawal."  *Id.*  The evaluating clinicians recommended placement in a

"therapeutic or more supportive setting," coupled with "both individual and group therapy."  *Id.*

Notwithstanding the student's conditions and these recommendations, the parents placed the

student in a Quaker school that was not approved for special education services, but which

offered small classes and an environment arguably supportive of the student's emotional needs.

*Id.* at 109, 113–14.  The student achieved "promising grades" at the school.  *Id.* at 113–14.  And

the parents supplemented that placement with private therapy.  *Id.*  After a hearing, the IHO

found that the parents had not met their burden of showing that the school was an appropriate

placement because the student required a therapeutic setting, with staff trained in meeting the

special needs attributable to the student's emotional disabilities, to reasonably assure he would

receive educational benefits. *See id.* at 111. After the SRO affirmed, the district court reversed both state officers, holding the placement appropriate. *Id.* at 107, 113.

The Second Circuit reversed. It held that the district court, "confronted with the same evidence" as the IHO and SRO, impermissibly imposed "its own view" that the student's needs were adequately addressed through the "combination" of the school placement and "private therapy." *Id.* at 113–14. In fact, the Circuit held, there was insufficient basis in the record to disturb the administrative officers' decisions, which had considered the student's "struggle with his emotional disturbance and his resulting inability to attend school." *Id.* The Circuit so held despite the "promising grades" had earned at the placement the parents had selected. *Id.* at 113. The Circuit cautioned that, "even where there is evidence of success, courts should not disturb a state's denial of IDEA reimbursement where . . . the chief benefits of the chosen school are the kind of educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not." *Id.* at 115. A unilateral private placement is appropriate, it stated, only if it provides "education instruction *specifically* designed to meet the *unique* needs of a handicapped child." *Id.* (emphases in original) (citation omitted).

As with the student in *Gagliardo*, L.C.W. has been diagnosed with ASD, depression, and anxiety (plus ADHD and trauma and stressor-related disorder). As with that student, L.C.W. has "high average" intellectual capacity, but her emotional and behavioral challenges have resulted in severe school refusal. As with that student, a purely academic placement—even one arguably sensitive to her emotional and behavioral needs, and contemplating coordination with an outside therapist—did not sufficiently address her substantial and documented emotional and behavioral

23

needs.[5]  In these circumstances, in *Gagliardo*, the Circuit rejected the parents' claim to tuition reimbursement for an academic placement coupled with outside therapy, where the record demonstrated that the student required a therapeutic environment in school.  This case presents the same situation, and indeed, even less reason to find the private placement appropriate: unlike in *Gagliardo,* L.C.W.'s placement at Winston immediately foundered, resulting in her transfer months after matriculating.  There is no more reason to disturb the SRO's decision than that in *Gagliardo*.

Other Second Circuit decisions reinforce this conclusion.  In *W.A. v. Hendrick Hudson Cent. Sch. Dist.*, 927 F.3d 126, 146–47 (2d Cir. 2019), the Circuit held that the SRO had properly found the parents' private placement inappropriate.  The SRO had so held, despite evidence of some progress by the student, that the private placement had "merely eliminated his exposure to . . . activities [the student] perceived as stressful."  *Id.* at 147.  It held that the parents had not shown that the placement was specially designed to meet the student's unique needs, and that the educational and environmental benefits from the private school were ones that "parents of any child, disabled or not," would prefer, and thus did not satisfy the IDEA.  *Id.*  The Circuit affirmed.  It held that (1) "the question of whether a private school placement provided special education services is precisely a question on which we defer to educational experts," and (2) the SRO had reasonably found the student's difficulties in school to "stem[] from underlying emotional and psychological issues that [the school] was not equipped to address."  *Id.*

---

[5] In 2021, L.C.W.'s evaluating clinician recommended a therapeutic placement; in 2022, the IEP recommended placement in a special education non-public school with weekly individual and group counseling; and in 2023—some two months before L.C.W.'s enrollment at Winston—the parents emphasized, in a letter to DOE, that she needed "ongoing therapeutic services and support, including social skills groups, executive functioning supports, [and] counseling."  SRO Decision at R8.

Similarly, in *Doe v. East Lyme Board of Education*, 790 F.3d 440, 451 (2d Cir. 2015), the Circuit upheld a decision by the SRO finding a private placement inappropriate, because the school "was not tailored to meet the Student's special needs, which had to be addressed by outside providers." It found that the small class sizes and modified grading procedures were educational advantages applicable to all students—but the school was not "an educational setting consistent with the clinician's recommendation" for the student's needs for specialized instruction. *Id.* at 451–52 (cleaned up). Where an SRO's determination along these lines was supported by the record, the Circuit held, "the district court should defer to the administrative hearing officer's educational experience." *Id.* (cleaned up).

These precedents are persuasive if not controlling here. The SRO's judgment—which it supported with ample citations to the record—similarly merits deference on what is ultimately a question for educational professionals on how to meet a particular student's social and emotional needs. Consistent with those precedents, the Court thus holds that the SRO did not err in finding that the parents had not carried their burden to show that Winston was an appropriate placement for L.C.W. during the 2023–2024 school year. *See, e.g.*, *Gagliardo*, 489 F.3d at 115 (parents did not show private placement appropriate where it was insufficiently tailored to student's particular needs); *W.A.*, 927 F.3d at 147 (same); *E. Lyme Bd. of Educ.*, 790 F.3d at 451–52 (same); *Stevens*, 2010 WL 1005165, at *9 (same); *Fragnito on behalf of L.F. v. Bd. of Educ. of Suffern Cent. Sch. Dist.*, No. 19 Civ. 1598, 2020 WL 4194804, at *11–13 (S.D.N.Y. July 21, 2020) (same); *John M. v. Brentwood Union Free Sch. Dist.*, No. 11 Civ. 3634, 2015 WL 5695648, at *9–10 (E.D.N.Y. Sept. 28, 2015) (same).

### 2.      The Parents' Critiques of the SRO Decision

The parents challenge the SRO's decision on three grounds.[6]

*First*, they argue that the SRO, in finding that they had not shown that L.C.W.'s placement at Winston was appropriate, did not consider the context in which they made that placement.  *See* Parents' Mem. at 12–16.  The SRO, they argue, should have given more weight to the facts that DOE, by not identifying an adequate placement for the 2023–2024 school year, had denied L.C.W. a FAPE for that year.  They rely on *M.M. v. New York City Department of Education*, No. 21 Civ. 3693, 2024 WL 3904771 (E.D.N.Y. Aug. 22, 2024), in which a district court upheld a unilateral private placement after DOE, across several school years, had not found a school that fit the IEP's recommendations for their child.

In fact, the SRO's exhaustive decision acknowledged that DOE had failed to offer L.C.W. a FAPE for the 2023–2024 school year.  SRO Decision at R9.  But the absence of a FAPE is inherent in cases that present the question of whether a parent's alternative placement was adequate.  And as the SRO recognized, DOE's regrettable failure to meet L.C.W.'s needs, while a necessary premise for the SRO's inquiry, did not bear on whether *Winston* adequately suited L.C.W.'s established needs.  The parents do not cite any legal authority for their contrary premise—that DOE's failure to even propose a full-year placement of its own significantly dilutes the showing a parent must make in support of their alternative placement.  The Court has not found such authority.

And *M.M.* is easily distinguished.  The student there had ASD and ADHD, and spoke both English and Spanish.  *M.M.*, 2024 WL 3904771, at *1.  DOE developed an IEP in 2017,

---

[6] These are in addition to the parents' overarching argument that Winston offered L.C.W. a sufficiently individualized educational program, *see* Parents' Mem. at 19–24, which the Court has addressed in the foregoing discussion.

which recommended a 6:1+1 bilingual nonpublic special education program. *Id.* Although it recommended a bilingual, DOE-run 12:1+1 special education program as an interim placement, it did not recommend a permanent placement for the next three school years. *Id.* The parents sought tuition reimbursement for their unilateral placement of the child in a private school. *Id.* The IHO and SRO denied the request, mainly because the school did not provide Spanish-language classes or speech-language therapy, whereas the most recent IEP called for placement in a Spanish special-education class with such therapy. *See id.* at *5. Reversing, the district court noted that: (1) the parents had been compelled to move the student somewhere, as her preschool did not continue through kindergarten and the district had not identified a permanent placement; (2) the record made "clear" that the private school the parents chose "ensured [the student] had access to resources crafted to fit her bilingual needs," including Spanish-speaking teachers and teaching assistants, such that the student "always had access to assistance in Spanish," as the IEP had recommended; (3) the student's progress at the private school confirmed that her education there was "reasonably calculated" to her needs; and (4) the school had individually tailored the student's education to the needs identified by the IEP, "including through her small-group instruction in phonics, language modeling, handwriting, and fine motor skills." *Id.* at *5–7. In rejecting the placement, the court held, the IHO and SRO had "required too precise a fit" between the placement and the IEP, "especially" in light of the demonstrated lack of any viable alternative. *Id.* at *5. The court thus held that the fit between the placement and the IEP was sufficiently close—not that DOE's failure to develop its own placement reduced the standard governing the parents' placement. The same is not so here. Unlike in *M.M.*, the program at the school chosen by the parents, as chronicled by the SRO and IHO, was not close to adequately tailored to L.C.W.'s needs; the private placement failed within months; and the

27

parents had not been compelled to move L.C.W. from her preceding placement, Academics West, which a separate administrative proceeding had found appropriately keyed to her specific needs so as to warrant tuition reimbursement.

*Second*, the parents argue that the SRO erred by not appreciating that the Focus class at Winston ostensibly satisfied the 2022 IEP's counseling services recommendation. *See* Parents' Mem. at 16–19. They argue that the SRO should have given more weight to parent L.W.'s testimony that the Focus class was "as close to [counseling] as you could expect" and that the Focus teacher "was helping [L.C.W.] cope with emotional issues," "was as thorough on [those issues] as we had experienced" with other care providers, and was in constant communication with L.C.W.'s outside therapist. Hr'g Tr. at R293–94. They argue that, through Focus, L.C.W. received more attention (one-on-one sessions for 45 minutes per school day) than recommended by the 2022 IEP (weekly group and individual counseling).

That critique is also off base. For one, its premise is wrong that the SRO (and IHO) treated the absence of school-provided counseling as the measure of whether the placement was appropriate. The SRO had broader concerns with Winston's fit. As a program "focus[ed] on academics" and executive functioning, the SRO found, it did not adequately support L.C.W.'s palpable emotional and behavioral needs. SRO Decision at R16. The absence of therapeutic counseling at Winston was only one factor in that determination. *See, e.g.*, *id.* at R15–16 (quoting Siegel's testimony that Winston was not an "emotional or behavior disabilities school," and instead "really focus[ed] on academics"); *id.* at R16 n.4 (noting that, in response to IHO's question whether, based on review of L.C.W.'s application materials, Winston believed L.C.W. "had emotional or behavioral needs to be addressed," Siegel did not answer directly, stating instead that Winston had determined it "would be able to provide . . . an appropriate . . .

28

academic setting"); *id.* at R17 ("notably absent from the fall 2023 report is any discussion of the specially designed instruction Winston [] implemented to address the student's social/emotional needs"); *id.* ("there is no evidence that Winston [] provided specially designed instruction other than academic and executive functioning supports for the student").

Beyond that, the record supplied a solid basis for the SRO's determination that L.C.W.'s Focus sessions were inadequate stand-ins for the therapeutic counseling centrally recommended by the 2022 IEP.[7] Siegel attested that the Focus program gave all Winston students "remedial instruction session[s]" based on students' "areas of greatest need," which "keeps students socially and emotionally engaged while ensuring we meet their unique academic and skill-based needs." Siegel Aff. at R191. As to L.C.W., the Focus section of her fall 2023 report from Winston states that L.C.W. was "not attending most of her content classes, but instead working with her Focus instructor to complete outstanding assignments." Fall 2023 Report at R164. It

---

[7] *T.K. v. New York City Department of Education*, 810 F.3d 869 (2d Cir. 2016), on which the parents rely on this point, is inapposite. *See* Parents' Mem. at 16. It upheld a unilateral placement despite findings by the IHO and SRO that offered inadequate counseling, speech therapy, and other services. *T.K.*, 810 F.3d at 878. In finding the placement appropriate, the Circuit held that, notwithstanding the absence of such services, the student's progress "across the board," "both academically and behaviorally," satisfied the parents' burden to show the placement was reasonably calculated to enable the student to receive educational benefits. *Id.* The same is not so here. *M.H. v. New York City Department of Education*, 685 F.3d 217 (2d Cir. 2012), supplies a more instructive contrast. The Circuit there upheld a private placement, distinguishing *Gagliardo*. *Id.* at 253–54. It found that a private school for autistic students, whose staff were trained in standardized methodologies for teaching autistic students and offered "intensive [] 1:1 instruction to its five students," was appropriate, despite the fact that the autistic child received certain related services, including counseling, at home. *Id.* at 228, 234, 237, 253–54. Although those services "to some extent enhance[d the student's] learning ability," the Circuit reasoned, "there is nothing in the record to suggest that it is necessary that they be provided during the school day" for the student to benefit from them. *Id.* at 253–54. The record here, in contrast, reflects that the 2021 evaluation and 2022 IEP had centrally recommended special needs instruction and counseling at school to address L.C.W.'s core emotional and behavioral needs, but Winston, with its emphasis on academics and executive functioning, did not provide these.

states that L.C.W.'s "Focus curriculum will target academic problem solving, reading comprehension, written expression, and media literacy," and then lists several bulleted goals under each curriculum item, such as "[i]ncrease academic confidence, resilience, and endurance in the online classroom," "[d]emonstrate literal and inferential comprehension using a variety of complex tests," and "[i]mplement editing and revision skills." *Id.* at R165. The record thus belies the suggestion that the Focus sessions were akin to therapeutic counseling. At most, it supports that these sessions were efforts, in coordination with L.C.W.'s outside therapist, to enhance her tolerance for a school setting—not a means to address her emotional and behavioral needs. *See Stevens*, 2010 WL 1005165, at *9 (holding private placement inappropriate, and rejecting argument that multiple one-on-one sessions with special education–certified instructor per week, for help with school assignments, adequately addressed student's particular needs).

*Third*, the parents argue, in passing, that the SRO and IHO erred by not resolving whether equitable considerations favored tuition reimbursement. Parents' Mem. at 24–25. That is legally wrong. Where parents have not met their burden to show a unilateral placement appropriate, administrative officials (and reviewing courts) "need not evaluate any equitable considerations." *R.S. ex rel. A.S. v. Lakeland Cent. Sch. Dist.*, No. 09 Civ. 9874, 2011 WL 1198458, at *6 (S.D.N.Y. Mar. 30, 2011), *aff'd sub nom. R.S. ex rel A.S. v. Lakeland Cent. Sch. Dist.*, 471 F. App'x 77 (2d Cir. 2012) (summary order); *see also Gagliardo*, 489 F.3d at 112 ("*If parents meet their burden*, the district court enjoys broad discretion in considering equitable factors relevant to fashioning relief." (emphasis added)).

30

## CONCLUSION

For the above reasons, the Court denies the parents' motion for summary judgment and grants DOE's cross-motion for summary judgment.[8]  The Clerk of Court is respectfully directed to terminate all pending motions and close this case.


SO ORDERED.

Paul A. Engelmayer

_____
PAUL A. ENGELMAYER
United States District Judge


Dated: March 19, 2026
       New York, New York

---

[8] Because the parents are not prevailing parties, the Court denies their motion for attorneys' fees. *See* 20 U.S.C. § 1415(i)(3)(B)(i)(I).

31